UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-civ-61072-WJZ

**FEDERAL TRADE COMMISSION**,

    Plaintiff,

v.

**AMERICAN PRECIOUS METALS, LLC**,
a Florida limited liability company,

and

**HARRY R. TANNER**, **JR.,** individually and as an owner, officer, and managing member of AMERICAN PRECIOUS METALS, LLC,

**ANDREA TANNER**, individually and as an owner, officer, and managing member of AMERICAN PRECIOUS METALS, LLC,

and

**SAM J. GOLDMAN**, **a/k/a SAMMY JOE GOLDMAN,** individually and as an owner or manager of AMERICAN PRECIOUS METALS, LLC.

    Defendants.

**PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST AMENDED
COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.    The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and

Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), and 57b.

3. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the

refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b, 6102(c), and 6105(b).

## DEFENDANTS

6. Defendant American Precious Metals, LLC, is a Florida limited liability company with its principal place of business in Deerfield Beach, Florida. American Precious Metals transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, American Precious Metals has advertised, marketed, distributed, or sold precious metals as investments to consumers throughout the United States.

7. Defendant Harry R. Tanner, Jr., is the president and a managing member of American Precious Metals. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of American Precious Metals, including the acts and practices set forth in this Complaint. Defendant Harry R. Tanner, Jr., resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. As an officer and managing member of American Precious Metals, Harry Tanner, Jr., is and has been responsible for: hiring, firing, and supervising the company's telemarketing staff; approving the company's telemarketing scripts; and obtaining the company's state telemarketing license. He is identified on the company's 2010 Commercial Telephone Seller Business License application as one of the persons responsible for management of American

Precious Metals and is a signatory on the company's financial accounts. Harry Tanner, Jr., receives and responds to consumers' complaints and inquiries.

8. Defendant Andrea Tanner is the vice president and a managing member of American Precious Metals. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of American Precious Metals, including the acts and practices set forth in this Complaint. Defendant Andrea Tanner resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. Andrea Tanner is identified on the company's 2010 Commercial Telephone Seller Business License application as one of the persons responsible for management of American Precious Metals.

9. Sam J. Goldman, aka Sammy Joe Goldman, is an owner or a manager of American Precious Metals. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of American Precious Metals, including the acts and practices set forth in this Complaint. Defendant Sam J. Goldman resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. As an owner or manager of American Precious Metals, Sam J. Goldman, is and has been responsible for: hiring, firing, and supervising the company's telemarketing staff; negotiating contracts; placing orders with the company's clearinghouse; and overseeing the day-to-day operations of the company.

## COMMERCE

10. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

11. Since at least June 2007, American Precious Metals and its principals, Harry R. Tanner, Jr., Andrea Tanner, and Sam J. Goldman (collectively "Defendants") have telemarketed precious metals, including silver, gold, platinum, and palladium, to consumers throughout the United States. Defendants operate telemarketing boiler rooms staffed with commissioned salespersons who cold-call consumers, many of whom are senior citizens or retirees, and promise to help them earn large profits quickly by investing in precious metals, with low or minimal investment risk.

12. When soliciting consumers to purchase precious metals, Defendants often rely on high-pressure, outbound telephone sales solicitations. Defendants call consumers and read a written sales script or present canned sales presentations that lead consumers to believe that precious metals are lucrative, safe investments. When telemarketing, Defendants often provide consumers with an inaccurate and incomplete description of the precious metals investment opportunity being offered.

13. Defendants tell consumers that precious metals prices are "poised to skyrocket" and are expected to reach a particular price within a short time period, often in as little as 30 to

60 days. In fact, precious metals markets are volatile and, although precious metals prices have risen over the past decade, short-term prices vary erratically.

14. According to their telemarketing script, Defendants tell consumers that the value of the U.S. dollar has fallen and will continue to fall, that the demand for a particular metal is growing "exponentially," that there are significant supply shortages of precious metals, and that a "frenzy of investors" is seeking to invest in precious metals. Defendants assure consumers that precious metals prices are going to continue to rise and imply that consumers who purchase precious metals will earn high profits in a short period of time.

15. Defendants also provide consumers with hypothetical examples of the profit potential of precious metals. These hypothetical examples often do not disclose the effect that commissions, fees, and interest charged to consumers has on the value of consumers' precious metals investments and, therefore, do not provide consumers with an accurate assessment of the profit potential of the precious metals.

16. Defendants augment their telemarketing efforts with written marketing materials and an Internet website. During telemarketing calls, Defendants offer to mail consumers additional materials about their precious metals investments. Defendants mail consumers marketing materials, including a high-quality, glossy brochure that includes general information about precious metals. The Defendants' marketing materials include statements that suggest that precious metals are profitable, low-risk investments, such as: "[M]any consider [silver] to be a greatly undervalued tangible asset poised for potentially dramatic price moves in the months and years ahead" and "[g]old, unlike paper currencies or other commodities, has retained its value during both crisis and calm periods throughout the history of civilization."

17. Defendants assure consumers, many of whom are investing their retirement savings, that precious metals have a low or minimal risk of loss. Defendants tell consumers that precious metals have been an investor's "safe haven" for thousands of years. Defendants also advise consumers, and the written materials they send to consumers expressly state, that Defendants do not deal with "risky" futures contracts.

18. Defendants' sales pitches and marketing materials also emphasize that precious metals are low-risk investments because they are purportedly tangible, physical assets. Defendants' telemarketing script states, "We deal only with the tangible, physical assets – in this case, bars, bullion, and coins." Defendants prominently offer to provide consumers with "secured storage or delivery" of their physical precious metals. Defendants' marketing brochures and website also state that the consumers' precious metals will be secured at a bank safe or depository.

19. In fact, Defendants do not use the money invested by consumers to purchase physical metal bars, bullion, or coins. Instead, after Defendants take their fees and commissions, the Defendants deposit consumers' investment funds in the account of a clearinghouse, which records the consumers' investments on its books and purchases metals derivatives, but does not maintain, acquire, or store physical precious metals. Accordingly, precious metals are neither held for consumers' benefit at secured depositories nor delivered to consumers. In fact, consumers are discouraged from taking possession of their purported precious metals and are told by Defendants that delivery is not recommended because of the additional costs to ship, insure, and inspect the precious metals.

20. Defendants often fail to inform consumers that the precious metals are sold in a leveraged transaction and that the money that the consumer agrees to invest with the Defendants

will only pay a portion of the total cost of the precious metals. Even when Defendants mention to consumers that the precious metals transactions are leveraged, they misstate or do not clearly explain the terms and conditions of the leveraged transaction.

21.     Likewise Defendants misrepresent and fail to disclose the total costs of consumers' investments. Consumers are not told by Defendants that the actual cost of their precious metals is up to two and one-half times greater than the amount that the consumer has agreed to invest and that a loan with interest is being issued to the consumer to pay for up to 80 percent of the purchase price.

22.     Defendants also misrepresent or fail to disclose the fees, commissions, or interest that consumers are required to pay to purchase or acquire the purported precious metals. Defendants tell consumers that 15 percent of the money that the consumer has agreed to pay to Defendants will be applied as a commission. In fact, Defendants charge consumers 15 percent of the total cost of the consumer's precious metals purchase – including the leveraged portion of the transaction. In addition, consumers must pay account opening fees of $250, a three percent markup over the currently-published market price of the precious metals, and interest on the leveraged portion of the transaction. In fact, more than 40 percent of the money that a consumer pays to Defendants is generally used to pay fees and commissions.

23.     In numerous instances, Defendants also do not inform consumers that they are likely to receive equity calls on their accounts, which will require consumers to invest additional money to keep their precious metals from being liquidated. In other instances, Defendants falsely tell consumers that an equity call will only be issued if precious metals prices drop by ten percent or more. In fact, Defendants issue equity calls whenever a consumer's equity in the

precious metals falls below 15 percent of the market value of the total metal itemized in the consumer's account.

24.     In most transactions, consumers' precious metals investments are opened with only 20 percent equity and the remaining 80 percent of the total cost of the precious metals is leveraged.  As a result, consumers' precious metals investments are vulnerable to equity calls with even a modest decrease in metals prices.  Moreover, because consumers' equity levels are constantly eroded by interest charged on the leveraged balances, consumers can be subject to equity calls even when precious metals prices remain constant.

25.     Consumers who, after listening to Defendants' telemarketing pitch, express interest in purchasing precious metals investments from Defendants are asked to sign and return a series of forms and contracts.  These forms and contracts contain fine-print, boilerplate disclosures that do not clearly alert consumers to the significant costs and risks associated with their precious metals investments.

26.     The Defendants' forms and contracts do not adequately disclose that the precious metals are highly-leveraged and incur interest charges; that consumers are likely to receive equity calls that will require consumers to pay additional money to prevent their precious metals from being liquidated; or the total costs – including all fees, commissions, interest charges, and leverage balances that consumers must pay to purchase and acquire the precious metals.

27.     In early 2010, Defendants began including a form entitled "Commission and Fee Disclosure" with its contracts, which summarily lists the fees, commissions, and interest charged by Defendants.  The "Commission and Fee Disclosure" form does not alert consumers that their transactions are leveraged, nor does it disclose the total fees, commissions, interest charges, and leverage balances that consumers must pay to purchase and acquire the precious metals.  The

"Commission and Fee Disclosure" form also does not inform consumers the quantity of metals being purchased or warn consumers that they are likely to receive equity calls that may require them to pay additional money to prevent their precious metals from being liquidated.

28.     Consumers who choose to purchase precious metals investments from Defendants are instructed by Defendants to complete and return the forms and contracts to American Precious Metals, along with a check, money order, or authority to wire transfer money to fund their investment.

29.     Consumers who purchase precious metals from Defendants see the equity in their precious metals investments drained by fees and commissions that are assessed at the inception of their transactions and by the constant accumulation of interest charges on the leverage portion of their accounts.  The fees, commissions, and interest charges negatively affect consumers' ability to breakeven or profit on the precious metals investments.

30.     In addition, American Precious Metals contacts consumers whose equity levels have risen and encourages them to use their equity to purchase additional precious metals on leverage.  To encourage consumers to purchase additional precious metals with their equity, Defendants cite to past price increases as indicia of future performance and tell consumers that their gains are "only the tip of the iceberg."

31.     When consumers use the equity from their investments to purchase additional precious metals, Defendants generate additional fees, commissions, and interest and ensure that consumers' equity levels remain low.  With low equity levels, consumers are unlikely to be in a position to withdraw funds and to realize any gains from their investments – or to demand delivery of the physical metals, which the Defendants do not possess.  Instead, consumers with

low equity levels remain subject to equity calls which force consumers to choose between paying additional money or having their precious metals partially or wholly liquidated.

32. When a consumer does not respond to an equity call by paying additional money or when a consumer's equity decreases to 10 percent of the consumer's total metal value, the consumer's precious metals account is liquidated, either partially or wholly. In some instances, consumers' accounts are liquidated without notice or forewarning. When an account is liquidated, the precious metals listed in the consumer's account are marked as "sold" and the "proceeds" are applied to the balance of the loan owed for financing the precious metals. If the account is wholly liquidated and funds remain after the consumer's loan is satisfied, they are remitted to the consumer.

## VIOLATIONS OF THE FTC ACT

33. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

34. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

### Misrepresentations in Violation of Section 5

35. In numerous instances, in connection with the marketing, offering for sale, or sale of precious metals, Defendants, directly or indirectly, expressly or by implication, make material representations, including that:

    (a) Consumers are likely to earn high or substantial profits in a short time period on the precious metals sold by Defendants; and

  (b)  The precious metals sold by Defendants are low or minimal risk investments.

36. In truth and in fact, in numerous instances in which Defendants make the representations set forth in Paragraph 35 of this Complaint:

  (a)  Consumers are not likely to earn high or substantial profits in a short time period on the precious metals sold by Defendants; and

  (b)  The precious metals sold by Defendants are not low or minimal risk investments.

37. Therefore, Defendants' representations as set forth in Paragraph 35 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II.

**Failing to Adequately Disclose Material Information in Violation of Section 5**

38. In numerous instances, in connection with the marketing, offering for sale, or sale of precious metals, Defendants, directly or indirectly, expressly or by implication, represent that the precious metals sold by Defendants are likely to earn consumers high or substantial profits in a short time period, with a low or minimal risk of loss of the investment.

39. In numerous instances in which Defendants make the representation set forth in Paragraph 38, Defendants fail to adequately disclose to consumers material information concerning the precious metals, including:

  (a)  The total fees, commissions, interest charges, and leverage balances that consumers are required to pay; and

      (b)      That consumers are likely to receive equity calls that will require consumers to pay additional money or to liquidate their precious metals.

40. Defendants' failure to adequately disclose the material information described in Paragraph 39, in light of the representation described in Paragraph 38, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

41. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994.  On August 16, 1995, the FTC adopted the Telemarketing Sales Rule (the "Original TSR"), 16 C.F.R. Part 310, as subsequently amended.

42. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd).

43. Defendants have initiated "outbound telephone calls" on behalf of persons who are "sellers," as those terms are defined in the TSR, 16 C.F.R. § 310.2(v) and (aa).

44. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability.  16 C.F.R. § 310.3(a)(2)(vi).

45. The TSR also prohibits sellers and telemarketers from failing to disclose truthfully, in a clear and conspicuous manner, and before a customer pays for goods or services:

      (a)      The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer.  16 C.F.R. § 310.3(a)(1)(i); and

      (b)     All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer. 16 C.F.R. § 310.3(a)(1)(ii).

46.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Misrepresenting an Investment Opportunity

47.     In numerous instances, in connection with the telemarketing of precious metals, Defendants, directly or indirectly, expressly or by implication, misrepresent the risk, earnings potential, or profitability of the precious metals by falsely claiming that:

      (a)     Consumers are likely to earn high or substantial profits in a short time period on the precious metals sold by Defendants; and

      (b)     The precious metals sold by Defendants are low or minimal risk investments;

48.     Defendants' acts or practices, as described in Paragraph 47, violate the TSR, 16 C.F.R. § 310.3(a)(2)(vi).

## COUNT IV

### Failing to Clearly and Conspicuously Disclose Total Costs

49.     In numerous instances, in connection with the telemarketing of precious metals, Defendants fail to disclose truthfully, in a clear and conspicuous manner, before a customer pays for goods and services offered, material information about the total costs to purchase or receive

or the quantity of the precious metals, including, but not limited to, disclosing the total fees, commissions, interest charges, and leverage balances that consumers are required to pay.

50. Defendants' acts or practices, as described in Paragraph 49, violate the TSR, 16 C.F.R. § 310.3(a)(1)(i).

## COUNT V

### Failing to Clearly and Conspicuously to Disclose Material Conditions

51. In numerous instances, in connection with the telemarketing of precious metals, Defendants fail to disclose truthfully, in a clear and conspicuous manner, before a customer pays for goods and services offered, all material restrictions, limitations, or conditions to purchase or receive the precious metals, including, but not limited to, that consumers are likely to receive equity calls that will require consumers to pay additional money or to liquidate their precious metals.

52. Defendants' acts or practices, as described in Paragraph 52, violate the TSR, 16 C.F.R. § 310.3(a)(1)(ii).

## CONSUMER INJURY

53. Consumers suffer and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

54. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations

of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

55. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 4(a) of the Telemarketing Act, 15 U.S.C. § 6103(a), and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access to business premises, and appointment of a receiver;

B. Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

      D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

**WILLARD K. TOM**
General Counsel

Dated: October 11, 2011      /s/ Dama J. Brown
**DAMA J. BROWN**
Special Florida Bar No. A5501135
Email: dbrown1@ftc.gov
Telephone: (404) 656-1361

**BARBARA E. BOLTON**
Special Florida Bar No. A5500848
Email: bbolton@ftc.gov
Telephone: (404) 656-1362

**HAROLD KIRTZ**
Special Florida Bar No. A5500743
Email: hkirtz@ftc.gov
Telephone: (404) 656-1357

225 Peachtree Street, N.E., Suite 1500
Atlanta, Georgia 30303
Facsimile: (404) 656-1379

Attorneys for Plaintiff
**FEDERAL TRADE COMMISSION**